# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NICHOLAS J. FIORILLO, TRACY KROWEL, ROBERT DEPIETRI, JR., KIMBERLY DEPIETRI, SHREWSBURY STREET DEVELOPMENT COMPANY and ERIE AVENUE RESIDENTIAL REALTY TRUST | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-40015-FDS |
| v. | ) ) | |
| DAVID G. MASSAD, PAMELA MASSAD, MARCELLO MALLEGNI, MICHAEL NORRIS COMMERCE BANK AND TRUST COMPANY GAMEWELL REALTY, INC., LBM FINANCIAL, INC. AND WOLFPEN FINANCIAL, LLC | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DAVID G. MASSAD, PAMELA MASSAD AND GAMEWELL REALTY, INC.'S MOTION FOR SANCTION OF DISMISSAL IN ACCORDANCE WITH FED. R. CIV. P 37 FOR PLAINTIFFS' WILLFUL AND INTENTIONAL VIOLATION OF THE COURT'S JUNE 2, 2010 DISCOVERY ORDER

On June 2, 2010, this Court (Hillman, MJ) entered a straightforward discovery order, requiring the Plaintiffs to comply with valid and proper discovery requests served in February, 2010 "within ten (10) days of the date of this Order" or before June 12, 2010. See Docket No. 171.

Despite the fact that this case was filed more than three years ago, despite the fact that these discovery requests have been pending for nearly six months, despite the parties' regular status conferences with the Court where the Plaintiffs' non-compliance with discovery has been repeatedly discussed, despite a motion to compel and despite a plain and unambiguous Court Order requiring that the Plaintiffs comply, the Plaintiffs

have still not produced a single document, have not answered a single interrogatory and have not provided a written response to the Defendants' requests for production of documents.[1]

It should be clear to the Court that the Plaintiffs have no serious interest in litigating this case or complying with their most basic and fundamental obligations associated with litigating a case. The Plaintiffs seem much more interested in launching a website and otherwise informing the press and the public that they have filed a RICO case against these Defendants rather than actually litigating this case. It is time for the Court to declare that 'enough is enough' and that the Plaintiffs, like all litigants, are accountable for their misconduct. This Court should enter a sanction of dismissal under Rule 37 for the Plaintiffs' knowing, willful and intentional failure to abide by the rules of this Court and the Court's plain and unambiguous discovery order requiring the Plaintiffs to comply with their most basic discovery obligations.

WHEREFORE, David Massad, Pamela Massad and Gamewell Realty, Inc. respectfully request that the Court enter a sanction of dismissal for the Plaintiffs repeated and ongoing failure to comply with their obligations.

---

[1] In response to the Defendants' motion to compel, the Plaintiffs promised to comply by early May. Obviously, the Plaintiffs failed to live up to this commitment.

Respectfully submitted,

DAVID G. MASSAD, PAMELA MASSAD
and GAMEWELL REALTY, INC.

By its attorneys,


/s/ David H. Rich
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626
drich@toddweld.com

Date:   June 15, 2010


## CERTIFICATE OF SERVICE

I, David H. Rich, hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered
participants on this date.

Date: June 15, 2010                          /s/ David H. Rich
                                             David H. Rich

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NICHOLAS J. FIORILLO, TRACY KROWEL, ROBERT DEPIETRI Jr., KIMBRLY DEPIETRI, SHREWSBURY STREET DEVELOPMENT COMPANY and ERIE AVENUE RESIDENTIAL REALTY TRUST )))))))) | |
| Plaintiffs, )) | |
| v. )) | C.A. #07-40015-FDS |
| DAVID G. MASSAD, PAMELA MASSAD, MARCELLO MALLEGNI, MICHAEL NORRIS, COMMERCE BANK AND TRUST COMPANY, GAMEWELL REALTY, INC., LBM FINANCIAL, INC., and WOLFPEN FINANCIAL, LLC, ))))))))) | |
| Defendants. )) | |

## AMENDED COMPLAINT AND JURY DEMAND

### NATURE OF THE CASE

1.    This is an action for damages arising under the Racketeer Influence and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., as well as claims under Massachusetts

law.  The predicate acts supporting the RICO counts include, mail fraud, bank fraud,

bankruptcy fraud, money laundering, obstruction of justice, loan sharking, and extortion. The

facts alleged also indicate violations of the Fair Housing Act, the Truth in Lending Act, the

Real Estate Settlement Procedures Act, and the Equal Credit Opportunity Act.

1

2.    This RICO enterprise has been directed and controlled by defendants David G.

("Duddie") Massad and Marcello Mallegni.  Their lending companies Gamewell Realty,

Wolfpen Financial LLC, LBM Financial LLC and Commerce Bank and Trust Company,

which the Defendants have used, controlled, and directed to commit these illegal acts, are

also members of the enterprise along with the other named defendants.

3.    It is alleged that all of the defendants acted in concert to defraud, extort, conspire against,

and deprive the Plaintiffs of monies, property and assets, and have attempted to place them

and their families out of their homes and in fear for their physical safety.  In addition, the

defendants have tried to force settlement of other pending State and Federal claims brought

against defendants David G. Massad, Pamela Massad, Marcello Mallegni, LBM Financial,

Commerce Bank and Gamewell Realty, by means of extortion and threats of physical harm

by attempting to strip any consideration the plaintiffs may receive from the outcome of these

other pending State and Federal claims brought against some or all of the above named

defendants.

4.    Defendants Massad and Mallegni through their various lending entities, including

defendants Gamewell Realty, Wolfpen Financial and LBM Financial would loan money to

individuals and entities and proceed to charge interest rates far in excess of the contractual

amount, often in violation of Massachusetts usury laws. This scheme was designed to

effectively strip the property of its equity and force the borrowers to refinance their loans for

a higher amount that would include the fraudulently-inflated interest. The defendants used

the threat of foreclosure to force the borrowers to agree to their fraudulent loan terms. In

2

addition, the defendants used their position to force borrowers to pay them kickbacks, whether in the form of cash or ownership interests in the various projects.

## PARTIES

5.      Plaintiff Nicholas J. Fiorillo ("Fiorillo") is an individual who resides in Worcester, Massachusetts.

6.      Plaintiff Tracy Krowel ("Krowel") is an individual who resides in Worcester, Massachusetts.

7.      Plaintiff Robert J. Depietri, Jr. ("Depietri") is an individual who resides in Worcester, Massachusetts.

8.      Plaintiff Kimbrly Depietri ("Kimbrly Depietri") is an individual who resides in Worcester, Massachusetts.

9.      Plaintiff Shrewsbury Street Development Corporation ("SSDC") is a Massachusetts corporation headquartered in Worcester, Massachusetts.

10.      Plaintiff Erie Avenue Residential Realty Trust, ("Erie Ave. Trust") was a duly organized Massachusetts Realty Trust.

11.      Defendant David G. "Duddie" Massad ("Massad") is an individual who resides in Westborough, Massachusetts.

12.      Defendant Marcello Mallegni ("Mallegni") is an individual who resides in Southborough, Massachusetts.

13.      Defendant Pamela Massad ("Pamela Massad") is an individual who resides in Westborough, Massachusetts.

3

14.    Defendant Commerce Bank and Trust Company ("Commerce Bank") is a federally insured financial institution headquartered in Worcester, Massachusetts.

15.    Defendant Gamewell Realty, Inc., ("Gamewell") is a Massachusetts corporation with its principal place of business in Northborough, Massachusetts.

16.    Defendant LBM Financial, Inc. ("LBM Financial") is a duly organized Massachusetts limited liability company with a principal place of business located at 171 Locke Drive, Marlboro, Massachusetts.

17.    Defendant Wolfpen Financial, LLC ("Wolfpen") is a duly organized Massachusetts limited liability company with a principal place of business located at 171 Locke Drive, Marlborough, Massachusetts.

## **Facts Common to All Counts**

18.    At all relevant times, plaintiff Fiorillo was engaged in the acquisition and development of commercial and residential properties in the central Massachusetts area.  Fiorillo is the husband of plaintiff Krowel and acted as her authorized agent.

19.    At all relevant times, plaintiff Krowel was engaged in the acquisition and development of commercial and residential properties in the central Massachusetts area.  Krowel is the wife of Fiorillo.  From time to time, Fiorillo and Krowel may be referred to collectively as "the Fiorillos."

20.    At all relevant times, plaintiff Depietri was engaged in the acquisition and development of commercial and residential properties in the central Massachusetts area.  Depietri is the husband of plaintiff Kimbrly Depietri.

4

21.    At all relevant times, plaintiff Kimbrly Depietri was the wife of Depietri. From time to

time, Depietri and Kimbrly Depietri may be referred to collectively as "the Depietris."

22.    At all relevant times, plaintiff Shrewsbury Street Development Corporation ("SSDC")

was a corporation duly organized under the laws of the Commonwealth of Massachusetts

with its corporate office located at 250 Commercial Street, Suite 415, Worcester,

Massachusetts. Fiorillo was the sole officer and director of SSDC.

23.    At all relevant times, plaintiff Erie Ave. Trust was a duly organized Massachusetts Realty

Trust. Depietri was the Trustee of the Erie Ave. Trust. The beneficial owners of the Erie

Ave. Trust were Depietri (50%) and Fiorillo (50%).

24.    At all relevant times, defendant Massad was the majority shareholder and Chairman of

defendant Commerce Bank. On information and belief, defendant Massad is also a major

financier of, and holds a significant ownership interest in, defendants Gamewell and LBM

Financial.

25.    At all relevant times, defendant Pamela Massad was an attorney licensed to practice law

in the Commonwealth of Massachusetts. Defendant Pamela Massad is the daughter of

defendant Massad and was an officer and Director of defendant Gamewell.

26.    At all relevant times, defendant Mallegni was the Manager of, and a substantial

shareholder in, defendants LBM Financial and Wolfpen.

27.    At all relevant times, defendant Gamewell was engaged in the business of lending money

to individuals and entities. This money typically came from private investors and typically

was loaned at a higher rate of interest than that provided by conventional financial

institutions. At no time relevant to this action, did defendant Gamewell file a Notice of Intent

5

to charge usurious interest with the Massachusetts Attorney General's Office in connection
with the Airline Lewis Loan.

28.     At all relevant times, defendant Wolfpen was engaged in the business of lending money
to individuals and entities. This money typically came from private investors and typically
was loaned at a higher rate of interest than that provided by conventional financial
institutions. At no time relevant to this action, did defendant Wolfpen file a Notice of Intent
to charge usurious interest with the Massachusetts Attorney General's Office in connection
with the 219 Forest Loan.

29.     At all relevant times, defendant LBM Financial was engaged in the business of lending
money to individuals and entities. This money typically came from private investors and
FDIC insured financial institutions through lines of credit and participatory loan agreements,
and typically was loaned at a higher rate of interest than that provided by conventional
financial institutions, usually double.

30.     At all relevant times, 219 Forest Street LLC was a limited liability corporation, duly
organized under the laws of the Commonwealth of Massachusetts, with a principal place of
business in Marlborough, Massachusetts. Plaintiff Kimbrly Depietri and David Depietri (the
brother of plaintiff Robert Depietri) each initially owned 50% of 219 Forest Street LLC.
After defendant Mallegni illegally gained a 40% ownership interest in 219 Forest Street LLC,
Kimbrly Depietri's and David Depietri's ownership interest each was reduced to 30%. As
shareholders in a closely held corporation, Kimbrly Depietri, David Depietri and defendant
Mallegni owed each other a fiduciary duty.

6

31.     At all relevant times, 219 Forest Street Realty Trust was a realty trust whose sole beneficiary was 219 Forest Street LLC. Plaintiff Depietri was the authorized agent of the 219 Forest Street Realty Trust. 219 Forest Street Realty Trust and 219 Forest Street LLC will be referred to collectively as ("219 Forest").

32.     At all relevant times, 201 Forest Street LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts. Plaintiff Kimbrly Depietri owned 20% of 201 Forest Street LLC.

33.     At all relevant times, 201 Forest Street Realty Trust was a realty trust whose sole beneficiary was 201 Forest Street LLC. Plaintiff Depietri was the authorized agent of the 201 Forest Street Realty Trust. The 201 Forest Street Realty Trust and 201 Forest Street LLC will be referred to collectively as ("201 Forest").

34.     At all relevant times, Old Centre Village Realty Trust ("Old Centre Trust") was a duly organized Massachusetts realty trust. Plaintiff Depietri was a Trustee of the Old Centre Trust and a 50% beneficial owner.

35.     At all relevant times, Lyman Development LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts. Plaintiff Depietri and his brother, David, each had a 30% ownership interest in Lyman Development LLC. Defendant Mallegni held a 40% ownership interest in Lyman Development LLC. As shareholders in a closely held corporation, Plaintiff Depietri, David Depietri and defendant Mallegni owed each other a fiduciary duty.

7

36.    At all relevant times, The Lyman Development Realty Trust, ("Lyman Development Trust") was a duly organized Massachusetts realty trust, whose sole beneficiary was Lyman Development LLC.  Plaintiff Depietri was the Trustee of the Lyman Development Trust.

37.    At all relevant times, 230 Maple Street LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  Plaintiff Depietri, his brother David, and defendant Mallegni each had a 33.33% ownership interest in 230 Maple Street LLC.  As shareholders in a closely held corporation, Plaintiff Depietri, David Depietri and defendant Mallegni owed each other a fiduciary duty.

38.    At all relevant times, 230 Maple Street Realty Trust ("230 Maple Street Trust") was a duly organized Massachusetts realty trust, whose sole beneficiary was 230 Maple Street LLC.  Plaintiff Depietri was the Trustee of the 230 Maple Street Trust.

39.    At all relevant times, 57 East Main Street, LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  Plaintiff Depietri and David Depietri each initially owned 50% of 57 East Main Street LLC.  After defendant Mallegni gained a 25% ownership interest in 57 East Main Street, LLC, Plaintiff Depietri's and David Depietri's ownership interest was reduced to 37.5% each.  As shareholders in a closely held corporation, Plaintiff Depietri, David Depietri and defendant Mallegni owed each other a fiduciary duty.

40.    At all relevant times, 57 East Main Street Realty Trust ("57 East Main Street Trust") was a realty trust whose sole beneficiary was 57 East Main Street, LLC.  Plaintiff Depietri was the authorized agent of the 57 East Main Street Trust.

8

41.     At all relevant times, 65 Boston Post Road Realty Trust ("Boston Post Road Trust") was

a duly organized Massachusetts realty trust, whose sole beneficiary was 65 BPW LLC.

Depietri was the Trustee of the Boston Post Road Trust. At all relevant times, the Boston

Post Road Trust owned a commercial office building located at Boston Post Road West.

42.     At all relevant times, 65 BPW LLC was a limited liability corporation, duly organized

under the laws of the Commonwealth of Massachusetts, with a principal place of business in

Marlborough, Massachusetts. The owners of 65 BPW LLC were: Plaintiff Kimbrly Depietri

(13.33%), David Depietri (13.33%) Louise Depietri (13.33%), Vision Holding Corporation

(10%) and Colonial Capital Corporation (50%).

43.     On or about November 1, 2000, defendant Norris entered into a 10 year lease agreement

with the Boston Post Road Trust to lease office space in the 65 Boston Post Road West

building. Under the terms of the 10 year lease, Norris was required to make payments

totaling approximately $544,000 to the Boston Post Road Trust.

44.     On or about May 25, 2004, the Federal Deposit Insurance Corporation and the

Massachusetts Division of Banks served Commerce Bank with an Order to Cease and Desist,

based upon the bank's unsafe and unsound lending practices.

45.     At all relevant times, usury was the practice of charging an excessively high rate of

interest on money loaned. Under Massachusetts General Laws c. 271 §49, a loan is usurious

if it charges interest in excess of 20% per annum, inclusive of all fees and penalties.

46.     At all relevant times, pursuant to Massachusetts General Laws c. 271 §49, an individual

or entity could lend money at a usurious rate if it notified the Attorney General of its intent to

engage in such a transaction.

## The Airline Lewis Building Loan

47.    In or around June, 2002, Fiorillo, who at the time was 27 years old, sought to acquire a

commercial property located at 267 Shrewsbury Street, Worcester, Massachusetts consisting

of approximately 12,000 square feet of commercial space formerly occupied by a window

blind manufacturing company known as the "Airline Lewis Company" (the "Airline Lewis

Building"). The purchase price of the Airline Lewis Building was $398,000. Fiorillo made a

deposit on the property of $38,000.

48.    In order to acquire the Airline Lewis Building, Fiorillo approached defendant Massad,

who, at that time, was a family friend, employer and previous financial backer of Fiorillo, to

finance the balance of the $398,000 purchase price.

49.    In his various discussions with defendant Massad, Fiorillo was led to believe that the

acquisition financing would be provided through defendant Commerce Bank at a

conventional rate.

50.    On or about September 13, 2002, Fiorillo arrived at the offices of Fletcher, Tilton &

Whipple in Worcester, Massachusetts for the closing of the Airline Lewis Loan.

51.    At that time, Fiorillo first learned that the loan terms were not conventional and, in fact,

that the loan was being made not by defendant Commerce Bank but by defendant Gamewell.

Defendant Pamela Massad presented Fiorillo with a Loan Agreement for a $575,000 loan.

Under the terms of the loan agreement, only $363,000 was to be advanced to Fiorillo to pay

for the property. The remaining $212,000 was "additional interest." Defendant Pamela

Massad also presented Fiorillo with a Demand Note in the amount of $575,000 at an above-

market interest rate of 15%.

10

52.  Fiorillo protested to defendant Pamela Massad that these were not the loan terms on

which he and defendant Massad had agreed.  Defendant Pamela Massad replied that her

father had changed the deal and he could take it or leave it.  Fiorillo then called defendant

Massad who told him to sign the deal with defendant Gamewell and they would address his

concerns later.  Defendant Massad further stated to Fiorillo that the $212,000 could be used

as an interest reserve from which the monthly interest payments on the advanced funds could

be made.  Defendant Massad concluded the conversation by telling Fiorillo, "Son, you can

trust me."  Fiorillo, fearing the loss of his deposit and relying on the representations of

defendant Massad agreed to proceed with the loan.

1.  On or about September 13, 2002, Fiorillo and defendant Gamewell entered into a loan

agreement for $575,000 secured by a mortgage on the Airline Lewis property.  The loan

agreement was signed by Fiorillo and defendant Pamela Massad, as Vice-President of

Gamewell.

2.  On or about February 26, 2003, Fiorillo received an offer of $600,000 to purchase the

Airline Lewis property.  Fiorillo contacted defendant Massad for a payoff figure for the

Airline Lewis loan.  Defendant Massad fraudulently stated to Fiorillo that the payoff amount

on the loan was $630,000, which represented an effective interest rate of over 175% on the

funds actually advanced.  Defendant Massad steadfastly refused to recalculate the payoff

amount at the non-usurious rate of interest set forth on the Note and Fiorillo lost the sale.

3.  On or about December 12, 2003, Fiorillo received an offer of $800,000 to purchase the

Airline Lewis property.  Fiorillo again contacted defendant Massad for a payoff figure for the

Airline Lewis loan.  Defendant Massad fraudulently stated to Fiorillo that the payoff amount

11

on the loan was $860,000, which represented an effective interest rate of over 40% of the

total amount of the Note and over 100% on the funds actually advanced. Defendant Massad

steadfastly refused to recalculate the payoff amount at the non-usurious, contract rate of 15%

and Fiorillo lost the sale.

4.      On or about September 10, 2004, Fiorillo received an offer of $760,000 to purchase the

Airline Lewis property. Fiorillo yet again contacted defendant Massad for a payoff figure for

the Airline Lewis loan. Defendant Massad fraudulently stated to Fiorillo that the payoff

amount on the loan was $ 850,000, which represented an effective interest rate of over 67%

on the funds actually advanced. Defendant Massad steadfastly refused to recalculate the

payoff amount at the non-usurious, contract interest rate of 15% and Fiorillo lost the sale.

5.      In or around the fall of 2005, at the instruction of defendant Massad, defendant Mallegni

asked Depietri to assist Fiorillo in his efforts to develop the Airline Lewis Building.

Defendant Mallegni informed Depietri that if he assisted Fiorillo, defendant LBM Financial

would provide financing for the project and pay off defendant Gamewell.

6.      Depietri began to assist Fiorillo in his efforts to resolve the dispute he had with defendant

Massad and develop a use for the Airline Lewis Building. Within a very short time frame

they had made arrangements with a national fitness center to become a potential tenant.

Based upon these arrangements, Depietri and Fiorillo contracted various architects and

engineers including Universal Architects of Holliston, MA and CFS Engineering of

Worcester to design a facility around the tenant needs. In addition, Depietri and Fiorillo

entered into negotiations with adjacent landowners to secure additional parking for the

proposed fitness center.

12

7.   In or around February, 2006, after Depietri and Fiorillo had spent tens of thousands of dollars and hundreds of hours of time and received a proposed closing date and term sheet from defendant LBM Financial, defendant Mallegni informed Depietri and Fiorillo that defendant Massad did not want defendant LBM Financial to lend money to Depietri and Fiorillo to develop the property.

8.   Defendant Mallegni further informed Depietri that if he wanted to have a prosperous and continued relationship with defendants LBM Financial and Commerce Bank, he would have to back out of Fiorillo's development efforts immediately and distance himself from Fiorillo both financially and otherwise.

9.   In or around the second week in February 2006 a meeting took place at the offices of LBM Financial which was attended by Fiorillo, Depietri, defendants Massad and Mallegni, and an associate of defendant Massad from Rhode Island ("Massad's Rhode Island associate").   During the course of this meeting, defendants Massad and Mallegni and defendant Massad's Rhode Island associate demanded that Fiorillo deed the Airline Lewis Building over to defendant Massad and to pay immediately all outstanding monies owed to defendant Gamewell. Defendants Massad and Mallegni further threatened to foreclose Fiorillo's other outstanding loans with their various other lending companies, including defendant Commerce Bank's loan on Fiorillo's family home located at 425B Salisbury Street, Worcester. Defendant Massad and his Rhode Island associate also made numerous physical threats to Fiorillo to induce him to deed over the Airline Lewis Property. Specifically, defendant Massad told Fiorillo, "If this was twenty years ago, you'd be dead kid. Now sign the fucking deed!"

13

10.     On or about May 3, 2006, defendant Pamela Massad, as Clerk of defendant Gamewell

mailed an Acceleration and Demand letter to Fiorillo. In this letter, defendant Pamela

Massad demanded the immediate payment to defendant Gamewell of $931,216.69. This

usurious, fraudulently inflated "Demand Amount" included not only an alleged "principal

balance" of $593,092 (which included the $212,000 of "pre-paid interest" but also an

additional $325,329.00 in interest and $12,795.69 in "unpaid late charges." This resulted in

an effective annual interest rate of 47% on the amount actually loaned to Fiorillo.

### The 219 Forest Street Loans

11.     On or about August 5, 1998, defendant Wolfpen loaned 219 Forest $1,200,000 to

purchase a 26 acre parcel of land located at 219 Forest Street in Marlborough, Massachusetts.

To secure the loan, the 219 Forest gave defendant Wolfpen a Note that required interest-only

payments at the stated interest rate of 15% per annum and a first priority Mortgage on the

Property (the "Wolfpen Loan"). Defendant Mallegni signed the loan documents on behalf of

defendant Wolfpen. Depietri loaned 219 Forest $200,000 of personal funds to be used as a

down payment on the property.

12.     In or around September 1999, after the Wolfpen Loan had matured, defendant Mallegni

arranged for Hudson Savings Bank to loan to 219 Forest $650,000 (the "Hudson Note").

Defendant Wolfpen was paid all of the proceeds of the Hudson Note, but defendant Mallegni,

nevertheless demanded that 219 Forest execute a separate Note secured by a second mortgage

on the property, to defendant Wolfpen in the amount of $734,688 (the "Wolfpen Note"),

which defendant Mallegni alleged to be the remaining balance on the Wolfpen Loan.

Depietri informed defendant Mallegni that the claimed balance included a usurious amount of

14

interest and, therefore, he objected to providing the Wolfpen Note. Specifically, defendant

Mallegni's calculation of the interest amounted to a usurious rate of approximately 32%.

Defendant Mallegni threatened to foreclose on the Property if 219 Forest refused to sign the

Wolfpen Note. Faced with this threat, Depietri acceded to defendant Mallegni's demand and

219 Forest signed the Wolfpen Note and second mortgage.

13.    As a result of Mallegni's demand for the usurious and fraudulently inflated interest

payment, 219 Forest lost over $153,000 in overpaid interest to defendant Wolfpen.

14.    In or around March 2001, when the Hudson and Wolfpen Notes had matured, defendants

Mallegni and Massad arranged a $1,800,000 loan from defendant Commerce Bank to 219

Forest. Depietri intended that 219 Forest would use the proceeds to pay the Hudson Note in

full as well as what he believed to be the outstanding balance on the Wolfpen Note of

$670,779. Defendant Mallegni, however, fraudulently claimed that defendant Wolfpen was

owed actually owed $907,517.

15.    On or about March 20, 2001, at the closing on the Commerce Note, defendant Mallegni

demanded, for the first time, that 219 Forest execute a $236,738 interest-only note to

defendant LBM Financial at a rate of 16% (the "March Note"). The March Note represented

the difference between what defendant Mallegni fraudulently claimed defendant Wolfpen

was owed under the Wolfpen Note and the actual, outstanding balance of the Note. In effect,

defendant Mallegni was seeking to collect interest on the excessive interest defendant

Wolfpen already had overcharged fraudulently to 219 Forest. Defendant Mallegni threatened

that unless the 219 Forest signed the March Note and granted defendant LBM a second

15

mortgage, defendant Commerce Bank would not close on its loan and defendant Mallegni

would foreclose on the Wolfpen Note.

16.     As a further condition on the loan, at the closing defendant Mallegni demanded a 40%

personal ownership interest in 219 Forest as a condition to signing the repurchase agreement.

Defendant Mallegni also demanded that Depietri and his brother assign to defendant LBM

Financial their right to receive $202,271 in reimbursements from an unrelated development

project of theirs.  Defendant Mallegni told Depietri that the $202,271 would be applied to the

balance to the March Note.  Again, faced with a threat of foreclosure from defendant

Mallegni, 219 Forest executed the March Note and granted defendant Mallegni a 40%

interest in 219 Forest.  The loan from defendant Commerce Bank was then allowed to close.

17.     From on or about March 20, 2001 through in or around June 2002, Depietri personally

paid $202,271 to LBM Financial, ostensibly to pay down the March Note.  By June 2002,

according to defendant LBM's own internal accounting records, the March Note had been

paid down to $112,000.

18. In or around the fall of 2001, Depietri began to seek takeout and construction loans to

develop the 219 Forest Street project and pay off the Commerce Note.

19.     By in or around March 2002, Depietri received a commitment from First Essex Bank for

approximately $7,000,000 to pay off the Commerce Note and the March Notes before they

came due, and to provide construction financing to develop the property.

20.     At the direction of defendant Massad, defendant Mallegni, as a 40% owner of 219 Forest,

refused to agree to the First Essex Bank proposal and instead directed Depietri to obtain the

takeout and construction loan from defendant Commerce Bank.  Defendant Mallegni

16

threatened Depietri that if he did not refinance the loan with Commerce Bank, defendant

LBM would foreclose on March Note and otherwise interfere with other projects in which

Depietri had an interest.  As a result of the defendants' threats and fraudulent inducements,

219 Forest allowed the First Essex loan commitment to lapse and the Commerce Note and

the March Note matured and came due.

21.    In or around June 2002, after initially agreeing to match the terms of the First Essex loan

proposal, defendant Massad caused defendant Commerce Bank to withdraw its loan

commitment and instead offer 219 Forest a $5 million financing package, which was

$2 million less than the First Essex commitment.  When Depietri informed defendant Massad

that the new loan proposal did not contain enough money to finance the construction of the

project, defendant Massad caused defendant Commerce Bank to claim that the Commerce

Note had matured, and threatened immediate foreclosure.

22.    In or around December 2002, with 219 Forest facing the threat of foreclosure by

defendant Commerce Bank, and defendant Massad needing to get a "troubled loan" off the

books of defendant Commerce bank by the end of the year, defendants Mallegni and Massad

caused defendant LBM Financial to loan 219 Forest $1,733,632, ostensibly to enable 219

Forest to pay off the Commerce Note.  On information and belief, these funds came from

various investors, including defendants Massad, Mallegni and Commerce Bank.

23.    On or about December 31, 2002, 219 Forest and defendant Mallegni executed a note in

the amount of $1,733,632 (the "December Note") payable to defendant LBM Financial.  The

December Note was for a term of one year, and called for interest-only payments at a rate of

14% per annum.  The December Note was secured by a first mortgage on the 219 Forest

17

Street Property. In addition, immediately prior to the closing, defendant Mallegni demanded

additional collateral. Specifically, defendant Mallegni threatened not to close the loan and to

allow defendant Commerce Bank to foreclose on its note unless defendant LBM received a

guaranty from 201 Forest, secured by a mortgage on property it owned, located at 201 Forest

Street in Marlborough, Massachusetts. The March Note in favor of defendant LBM Financial

and secured by a second mortgage on the 219 Forest Street property would remain in place.

Depietri, in fear of foreclosure and having already invested over $1 million in the project with

219 Forest, agreed to defendant Mallegni's demands.

24.     On or about December 31, 2002, 219 Forest paid off the Commerce Note.

25.     On or about December 19, 2003, defendant Mallegni agreed to extend the December Note

at the same interest rate, provided that 219 Forest pay one point.

## Defendant Norris Breaches his Lease and the
## Attempted Extortion by defendants Mallegni and Norris

26.     In or around January 2004, defendant Mallegni instructed defendant Norris to break his

lease with the Boston Post Road Trust and move into an office building owned by defendant

Mallegni.

27.     On or about January 28, 2004, defendants Mallegni and LBM Financial wrote to 219

Forest and demanded additional concessions in order to extend the December Note, including

a payment of an additional three points, and a release of defendant Norris from his lease

obligations with the Boston Post Road Trust. If these demands were not met, defendant

Mallegni informed Depietri that defendant LBM Financial would refuse to extend the

December Note and would declare a default.

18

28.    On or about January 30, 2004, defendant Norris sent a letter to Depietri which stated that

defendant Mallegni would sign the extension to the December Note after Depietri agreed to

release Norris from his lease with the Boston Post Road Trust.

29.    In or around March 2004, although Depietri had not released attorney Norris from his

lease obligations, Norris breached his lease and moved into office space owned by defendant

Mallegni.  At the time Norris breached the lease, he owed the Boston Post Road Trust

approximately $385,000 under the terms of the balance of the lease.

30.    In or around March of 2004, defendants Mallegni and LBM Financial began assessing the

December Note at a purported "default rate" of 20% plus interest plus 1 point per month,

compounded daily, an effective rate of interest of approximately 34% annually.  Defendants

LBM Financial and Mallegni, however, took no further action to enforce the December Note

at that time and continued to accept the previously agreed upon 14% interest payments from

219 Forest.

### Defendants LBM Financial, Mallegni and Norris Fraudulently Obstruct the Refinancing Efforts of 219 Forest

31.    By in or around November 2005, Depietri had obtained financing commitments that

would enable 219 Forest to pay off defendant LBM Financial and to fund construction of

office condominiums on the property.  Depietri also had obtained approximately $5,000,000

of pre-sales of the condominiums.

32.    On or about November 16, 2005, in order to close the new financing, Depietri requested

confirmation of the payoff amount for the March and December Notes from defendants

Mallegni and LBM Financial.

19

33.    On or about November 30, 2005, defendant Mallegni informed Depietri that 219 Forest

owed LBM approximately $3,500,000 in principal, interest and fees on the two loans. This

amount exceeded the amount actually due on the March and December Notes by

approximately $1.3 million. In his calculation, defendant Mallegni had not applied any of the

payments made by Depietri to the March Note and sought the entire principal amount of

$236,738 plus a usurious amount of interest.

34.    From on or about December 13, 2005 through in or around February 2006, Depietri

repeatedly requested that defendant Mallegni provide a corrected payoff figure for the March

and December Notes so that 219 Forest could obtain financing and honor its $5,000,000 in

pre-sales of offices and condominiums.

35.    From in or around November 2005 through in or around February 2006, defendant

Mallegni refused to provide an accurate payoff amount, for the March and December Notes

and, as a consequence, 219 Forest lost its lending commitment and the pre-sales.

### The DanversBank Fraud Scheme

36.    Unbeknownst either to Depietri or 219 Forest, on or about November 20, 2005, defendant

Mallegni caused LBM Financial to pledge the December Notes and mortgages on 219 Forest

and 201 Forest to DanversBank as collateral for an obligation of LBM Financial relating to

property in Manchester, New Hampshire in which defendants Mallegni and Massad held an

interest. Defendant Mallegni did not have the authority from the other investors to pledge the

December Note to DanversBank. Moreover, defendant Mallegni did not inform

DanversBank that: 1) he did not have the authority to pledge the December Note as collateral;

and 2) he previously had sold positions in the December Note through separate loan

20

participation agreements to other investors, including defendants Massad and Mallegni. As a consequence of defendant Mallegni's fraud upon DanversBank and LBM Financial's own investors, defendant Mallegni could not allow the December Note to be paid off and 219 lost its ability to refinance the project and escape defendant LBM's usurious and fraudulently calculated interest charges.

37.     On or about February 1, 2007, DanversBank assigned the December Note and Mortgages back to defendant LBM Financial in exchange for a second mortgage on 171 Locke Drive, Marlborough, Massachusetts, a building owned by defendant Mallegni.

### The Defendants Fraudulently Foreclose on the March and December Notes

38.     On or about February 20, 2007, defendant LBM Financial caused demand notices to be mailed to the trustees of 219 Forest and 201 Forest demanding the full and immediate repayment of the March and December notes, including approximately $3 million in fraudulently inflated interest charges.

39.     In or around February 2007, after 219 Forest had entered into a purchase and sale agreement with Forekicks II to purchase the property for $2,475,000, defendants Mallegni and Norris contacted representatives of Forekicks II to try to discourage them from purchasing the property. Specifically, they informed the representatives of Forekicks II that defendant LBM Financial intended to foreclose on the property and that Forekicks II then could purchase it at a reduced price.

40.     On or about April 18, 2007, defendants LBM and Mallegni caused a Notice of Intent to Foreclose to be mailed to the Trustees of 219 Forest and 201 Forest based on the refusal of

21

219 Forest to pay the fraudulently inflated loan amounts sought by defendants LBM Financial and Mallegni.

41.    From in or around November 2005 through in or around May 2007, defendants Mallegni and LBM Financial refused numerous requests to provide an accurate, non-usurious payoff amount for the December and March Notes.  As a result, between November 2005 and May 2007, 219 Forest has lost at least two other financing commitments that would have enabled it to pay off defendant LBM Financial and develop the property.

42.    On or about May 9, 2007, and June 19, 2007, both 219 Forest Street, LLC and 201 Forest Street, LLC, respectively, filed voluntary petitions for relief under the United States Bankruptcy Code initiating bankruptcy proceedings.

43.    On May 25, 2007, defendant LBM filed a false proof of claim in the United States Bankruptcy Court, seeking to recover $5,003,243.28 on the March and December notes. Included in this proof of claim is the full, original amount of interest on the March note, despite the fact that defendant LBM Financial's own internal accounting records state that the principal amount of the loan was paid down to $112,000 by June 2002.

44.    As a result of activities of defendants Mallegni, Massad, Wolfpen and LBM Financial, 219 Forest paid over $396,000 in usurious and fraudulently inflated interest payments and lost the ability to develop and profit from the 219 Forest project.

### 249 Lincoln Street Loan

45.    In or around April 2005, Fiorillo and Krowel approached defendants Mallegni and LBM Financial about obtaining a $550,000 loan to purchase a commercial property located at 249 Lincoln Street, Worcester, Massachusetts.

22

46.     On or about April 28, 2005, Krowel signed a loan commitment with defendant Mallegni, whereby defendant LBM Financial would loan Krowel $550,000 at an interest rate of 14% and payment of 3 points. Fiorillo signed the loan commitment as a Guarantor.

47.     On or about May 3, 2005, Fiorillo and Krowel attended the loan closing along with defendant Norris, who represented defendants LBM Financial and Mallegni. At the closing, defendant Norris informed Fiorillo and Krowel that defendant Mallegni had unilaterally changed the terms of the loan to 16% interest and the payment of five points. Norris further informed Fiorillo and Krowel that if they did not immediately assign a 25% ownership interest in a building that they owned on 157 Shrewsbury Street, Worcester to defendant Mallegni personally, defendant LBM Financial would not close the loan. This would result in Fiorillo and Krowel losing $20,000 in deposits and soft money already invested in the 249 Lincoln Street property, in addition to other damages, including a lawsuit for non-performance by the seller.

48.     On or about May 3, 2005, Fiorillo and Krowel signed the loan closing documents with defendant LBM Financial for a $550,000 loan secured by a mortgage on 249 Lincoln Street.

49. On or about May 3, 2005 Fiorillo and Krowel granted defendant Mallegni a 25% ownership interest in their building located at 157 Shrewsbury Street. Under the terms of the agreement, defendant Mallegni, although a 25% owner of the property, would not be responsible for any costs or expenses associated with the property.

50. By on or about November 10, 2005, Fiorillo and Krowel had secured a loan to refinance 249 Lincoln Street and contacted defendant LBM Financial to request a payoff figure.

23

51. On or about November 16, 2005, defendant Norris, on behalf of defendant LBM Financial, mailed Fiorillo and Krowel a notice of default and demand for the immediate payment of $648,758.48, which represented a fraudulently inflated interest rate that was well in excess of that set forth on the Note.

52. Thereafter, Fiorillo repeatedly requested an accurate payoff amount at the actual contract rate in order to secure refinancing on the property but defendants LBM and Mallegni and attorney Norris steadfastly refused.

53. Because of the refusal of defendants LBM Financial and Mallegni, to provide an accurate pay-off figure for the loan, Fiorillo and Krowel lost their financing and the loan went into foreclosure.

54. In or around May 2006, defendants Mallegni and LBM Financial caused a notice of foreclosure to be mailed to Fiorillo and Krowel which claimed that they owed approximately $783,000 on the 249 Lincoln Street Note. This amount represented a fraudulently inflated interest rate that was more than double that which was set forth in the Note.

### The Chase Building Loan

55. In or around the spring of 2000, Chase Building Associates II Limited Partnership ("CBA") sought to refinance its mortgage on a commercial property located at 44 Front Street, Worcester, Massachusetts, known as the Chase Building. The first mortgage was held by Wainwright Bank and trust and the second mortgage was held by defendant LBM Financial. Defendant Mallegni suggested to Depietri that he approach defendant Massad and defendant Commerce Bank for the refinancing.

24

56. In or around September 2000, Commerce Bank issued a loan commitment for the project of $3 million. Under the terms of the loan commitment, Depietri would guaranty the loan.

57. On or about September 20, 2000, defendant Mallegni informed Depietri that in order to close on the loan, defendant Massad would demand that CBA pay a "consultant's fee" to two associates of defendant Massad ("Massad's Worcester Associates"). Neither Depietri, nor anyone affiliated with CBA utilized Massad's Worcester Associates as consultants in connection with obtaining the refinancing from defendant Commerce Bank.

58. On or about September 20, 2000, the CBA loan closed. The HUD-1 Settlement Statement prepared by defendant Pamela Massad noted a $30,000 payment from the loan proceeds to pay a "broker's fee," although no broker was involved in the transaction. Upon information and belief, that $30,000 was paid to defendant Massad and his Worcester Associates.

59. On or about August 28, 2003, defendant Commerce Bank rewrote the CBA loan and lowered the interest rate from 8.5% to 7.5%. Under the terms of the loan rewrite, all rents collected from the Chase Building went into a "lock box" account at defendant Commerce Bank and the mortgage payment was deducted directly from that account.

## Old Centre Village Realty Trust Loan

60. On or about April 28, 2000 LBM Financial loaned $119,000 to the Old Centre Village Trust to acquire Lot 1A Pleasant Street in Framingham, MA, a vacant residential lot (the acquisition loan"). Defendant Mallegni required Depietri to sign a personal guaranty for the acquisition loan.

25

61. By in or around July, 2001 the Old Centre Village Trust had secured permits to construct a
single family home on the property and sought a $320,000 loan from LBM to refinance the
acquisition loan and for construction funds.

62. On or about July 11, 2001, Depietri attended the closing of the Old Centre Village
construction loan at the office of defendant LBM Financial's attorney, Michael Norris. In
reviewing the settlement statement, Depietri noticed that defendant LBM Financial claimed
that the payoff amount for the $119,000 acquisition loan was $230,903.11, which represented
an effective interest rate of 75%. Depietri questioned attorney Norris about the inflated the
inflated payoff amount and was told that the payoff "is what it is" and if Old Centre Village
wanted the construction loan to go through then Depietri had to sign the loan papers. Norris
further informed Depietri that defendant Mallegni was using the excess interest payments
from the Old Centre Village Realty Loan to pay off a loan of another one of LBM Financial's
borrowers who had defaulted on an unrelated land loan in Bolton, MA. Rather than lose the
entire project, Depietri signed the construction loan documents, which resulted in Old Centre
Village making an overpayment to LBM Financial of approximately $63,000.

63. On or about June 4, 2002, following the sale of the house, Depietri contacted defendant
LBM Financial to obtain the payoff amount on the construction loan.

64. On or about June 4, 2002, defendant Norris, on behalf of defendant LBM Financial informed
Depietri that the payoff amount was approximately $507,000.00. This amount represented an
effective interest rate of 24% and was $17,609 greater than the amount due to defendant
LBM Financial under the terms of the loan. Depietri questioned attorney Norris about this

figure. Attorney Norris admitted that the repayment amount was overstated, but refused to provide a correct payoff amount.

65. On or about June 4, 2002, Old Centre Village Trust paid the fraudulently inflated loan amount that defendant LBM Financial claimed it was owed on the construction loan. In total, Old Centre Village Trust paid defendant LBM Financial over $94,000 in fraudulent and usurious interest charges.

**Lyman Development Loan**

66. In or around August 2001, Lyman Development sought to acquire and develop a commercial property located on 44 Lyman Street, Northborough, Massachusetts ("the Lyman Street property").

67. On or about August 16, 2001, Lyman Development Realty closed on a construction loan from defendant LBM Financial in the amount of $368,841.83. The loan was secured by a second mortgage on the Lyman Street property. The loan documents were signed by Depietri and defendant Mallegni.

68. Between August 16, 2001 and August 22, 2002, Lyman Development made a series of draws on the construction loan.

69. In or around July 2002, Lyman Development was sued by a prospective tenant of the property, S&M Movers, to recover a $66,000 security deposit from the Trust ("the S&M Lawsuit"). Attorney Roy Bourgeois represented the plaintiffs S&M against Lyman Development.

70. By on or about August 22, 2002, the entire amount of the loan proceeds had been advanced to Lyman Development and the building had been completed.

71. In or around the fall of 2002, Lyman Development sought to pay off defendant LBM's loan through a refinance of the property through a conventional mortgage.

72. In or around the fall of 2002, Depietri, on behalf of Lyman Development requested a loan payoff figure from defendant LBM Financial.

73. Defendants LBM Financial and Mallegni refused to provide a loan payoff figure until shortly before the closing on the refinance loan, which was scheduled for October 1, 2002.

74. On or about October 1, 2002, defendant LBM Financial presented Lyman Development with a loan payoff figure that included $164,321.97 in fraudulently inflated interest payments. This represented an interest rate of slightly over 40%, and was approximately $48,100.00 in excess of the maximum amount of interest allowable under the loan documents.

75. Depietri protested the fraudulent payoff amount to defendant Norris, who represented defendant LBM Financial. Norris refused to permit any changes to the payoff figure.

76. Faced with the possible loss of the refinancing if it failed to meet the demands of defendant LBM Financial, Lyman Development paid the fraudulently inflated loan amount that defendant LBM Financial claimed it was owed on the construction loan.

77. In or around December 2002, the Lyman Street property was sold. Depietri, personally, received no money from the sale.

78. In or around January 2006, the S&M Lawsuit went to trial and Lyman Development was found liable to repay S&M its security deposit plus interest. None of the beneficiaries of Lyman Development were held personally liable, including Depietri.

28

### The 230 Maple Street Loan

79. In or around August 2001, the 230 Maple Street Trust sought to acquire a commercial

property located at 230 Maple Street, Marlborough, MA ("the 230 Maple Street property").

80. Defendant Mallegni arranged for a $900,000 loan from Milford National Bank and an

additional $200,000 loan from defendant LBM Financial, secured by a second mortgage on

the 230 Maple Street property.

81. On or about August 24, 2001, the 230 Maple Street Trust closed on the $200,000 second

mortgage loan from defendant LBM Financial. At the time of the closing, the 230 Maple

Street Trust pre-paid defendant LBM Financial $23,435.79 in interest.

82. In or around February 2004, the 230 Maple Street Trust requested a loan payoff figure from

defendant LBM Financial in anticipation of a pending sale of the property.

83. In or around February 2004, defendant LBM Financial provided the 203 Maple Street Trust

with a payoff figure $379,914.88, which included over $178,000 in fraudulently inflated

interest charges that were assessed in addition to the $23,435.79 in interest paid by 230

Maple Street at the closing. This fraudulently inflated interest amount sought by defendant

LBM Financial represented an effective annual interest rate of approximately 40%, and

exceeded the maximum amount of interest chargeable under the terms of the loan by

approximately $76,000.

84. Depietri protested this fraudulently high repayment to defendant Mallegni and defendant

Norris. Eventually, defendant Mallegni agreed to reduce the amount of interest due on the

LBM Loan to $50,668.72, which, nonetheless left the amount of interest due on the note,

fraudulently inflated by over $127,000 and represented an effective annual interest on the loan of approximately 32%.

85. On or about March 4, 2004 the 230 Maple Street property was sold to Bluefin Properties, LLC for $1.37 million. At the loan closing, defendant LBM Financial released is mortgage on the property.

86. From on or about March 5, 2004 through on or about April 5, 2005, defendant LBM Financial began billing the 230 Maple Street Trust for the $50,668.72 in fraudulent unpaid interest charges that it had agreed to deduct from the payoff amount, despite having released its mortgage on the 230 Maple Street property.

87. From on or about March 5, 2004 through on or about April 5, 2005, defendants LBM Financial and Mallegni, acting through defendant Norris, attempted to collect the $50,668.72 in fraudulent unpaid interest charges from Depietri by threatening to delay or withhold financing and re-financing of various Depietri-related projects by defendant LBM Financial.

88. On or about March 31, 2004, attorney Norris, on behalf of defendants LBM Financial and Mallegni, sent a letter to Depietri that fraudulently sought to condition the extension of loans from LBM Financial to 219 Forest on the payment to defendant Mallegni of $22,000 of the $50,668.72 in fraudulent unpaid interest charges.

**88 Shrewsbury Street Loan**

89.    In or around December 2004, Fiorillo approached defendant Mallegni about financing the purchase of a commercial building on 88 Shrewsbury Street, Worcester, Massachusetts. Defendant Mallegni agreed that defendant LBM Financial would loan Fiorillo $650,000. Of

this amount, $530,000 was for the purchase and the balance was to be used for interest reserve and construction.

90.     In or around December, defendants Norris and Mallegni informed Fiorillo that, as an "inducement" for defendant LBM Financial to make the acquisition and development loan, Fiorillo would have to give a 55% ownership interest in the property to defendants Mallegni and Norris or defendant LBM Financial would refuse to fund the loan.

91.     In or around December 2004, defendant Mallegni formed Shrewsbury Street Investment LLC ("SSI"). The owners of SSI were Fiorillo (45%) and defendants Mallegni and Norris (55% combined). Defendant Mallegni was the Manager of SSI.

92.     On or about December 16, 2004, defendant Mallegni, on behalf of SSI closed on loans, totaling approximately $800,750 to be used for the acquisition and development of 88 Shrewsbury Street, as well as to provide an interest reserve. Defendant LBM Financial was to administer the repayment of the loans. Fiorillo was required to sign a personal guaranty on the loans.

93.     Almost immediately, defendant LBM Financial began to charge SSI interest on the loan in excess of the stated contract rate. Over the course of the loan, defendant LBM Financial charged an effective interest rate of over 34%.

94.     In or around October 2006, Fiorillo gave in to defendant Mallegni's demands that he give back his 45% interest SSI, in order forestall defendants LBM Financial and Mallegni from pursuing their usurious collection attempts against other Fiorillo properties, including his personal residence.

31

95.     In or around January 2007, 88 Shrewsbury Street was sold for $820,000. Defendant

Mallegni claimed the pay-off was over $1,000,000 and ended up collecting all the proceeds

from the sale.

### The Manzi Parcels Loan & "Partnership"

96.     On or about April 12, 2005, Fiorillo signed a purchase and sale agreement to purchase

the former Manzi's Funeral Home and four adjacent parcels of land located at 175-181

Shrewsbury Street, Worcester, Massachusetts for $1.2 million (the "Manzi parcels"). Fiorillo

paid $15,000 in personal funds as a deposit.

97.     On or about April 12, 2005, Fiorillo approached defendant Mallegni about financing his

purchase of the Manzi parcels.

98.     On or about July 14, 2005 Fiorillo had received a commitment for $1,500,000 from

defendant LBM Financial to finance the purchase, development, construction and interest to

effectuate Fiorillo's purchase of the Manzi parcels and to start renovations on the existing

building. As an additional "inducement" for defendant LBM Financial to make the loan,

Fiorillo was required to assign 50% of his ownership interest in Manzi parcels to defendants

Mallegni and Massad. Rather than lose his deposit and all of the potential profit from the

development and sale of the Manzi parcels, Fiorillo acceded to their demands.

99.     On or about July 26, 2005, defendant Mallegni formed Shrewsbury Street General

Investment LLC ("SSGI"). The owners of SSGI were Fiorillo (50%) and defendants

Mallegni (25%) and Massad (25%). Defendant Mallegni was the Manager of SSGI.

32

100.   On or about August 17, 2005, defendant Mallegni, on behalf of SSGI closed on loans

totaling $1.7 million.  Of this amount, $1.2 million was used to purchase the property.

Defendant LBM Financial was to administer the repayment of the loans.

101.   On or about August 17, 2005, Fiorillo requested that defendant Mallegni provide him

with his stock certificates reflecting Fiorillo's 50% ownership in SSGI.  Defendant Mallegni

agreed to provide them to Fiorillo at some point in the future, but, at the time, defendant

Massad did not want to endorse them.

102.   From on or about August 17, through on or about the date of the complaint, defendant

Mallegni has refused to provide Fiorillo with the stock certificates, reflecting Fiorillo's 50%

ownership in SSGI, despite publically stating the Fiorillo was a 50% partner in the project.

103.   In or around November 2005, defendant Mallegni approached Depietri and asked for

assistance in the long term development plans of the entire site.  Depietri was further

induced to work on the project by Mallegni when a joint development was proposed

whereby, defendant Massad's position would be bought out and defendant Mallegni, Fiorillo

and Depietri would be equal 1/3 partners.

104.   Thereafter Fiorillo and Depietri invested substantial time and money in preparing

development plans for a 38,000 square foot mixed use retail/office/condo project that fully

capitalized on the site.  The proposed development project had a projected "as finished"

value of over $12 million.

105.   In or around the spring of 2006, defendant Mallegni informed Fiorillo and Depietri that

he no longer had any interest in developing the Manzi parcels.

106.    In or around September 2007, defendants Massad and Mallegni, without notice to, nor

approval by Fiorillo, listed one of the Manzi parcels with a sale price of $2.2 million.

### 157 Shrewsbury Street Loan (Piccolo's Restaurant)

107.    In or around February 2004, Fiorillo had negotiated the purchase of 157 Shrewsbury

Street, Worcester that contained four apartments and a 2,000 square foot first floor restaurant

space, now known as Piccolo's Italian Restaurant, (the "Piccolo's") for an initial price of

$520,000.

108.    In or around February 2004, Fiorillo contacted defendant Massad about financing the

balance of the purchase price through Commerce Bank.

109.    On or about May 25, 2004, defendant Commerce Bank was served by the FDIC with a

Cease and Desist order that accused the Bank and its directors of unsafe and unsound lending

practices.    Thereafter, defendant Commerce Bank declined to fund Fiorillo's purchase of

Piccolo's.

110.    By in or around June 2004, Fiorillo had made deposits on Piccolo's totaling $50,000.

The seller threatened to keep Fiorillo's deposits as liquidated damages unless the loan closed

by June 7, 2004.

111.    On or about June 6, 2004, defendant Mallegni called Fiorillo and informed him that

defendant Massad had arranged to do the loan through LBM for $520,000 at a 12% interest

rate and 2 points, which included an interest reserve for twelve months.

112.    On or about June 7, 2004, the date of the closing for the Piccolo's loan, Fiorillo received

a call from defendant Mallegni stating that defendant LBM would only loan Fiorillo

34

$360,000, instead of the promised $520,000. To keep from losing his $50,000 deposit,

Fiorillo arranged for the seller to take back a second mortgage of $120,000.

113.     Defendant Norris then presented Fiorillo with loan documents that reflected a 15%

interest rate and required the payment of five points.   Fiorillo complained to defendant

Norris, who, after consulting with defendant Mallegni agreed to reduce the interest rate to

14% with four points and an interest reserve. Defendant Norris further stated that Fiorillo

would have to sign the loan documents as they were prepared, but that they would be changed

later.  Faced with the potential loss of his deposit, Fiorillo agreed and signed the loan

documents.

114.     On or about July 1, 2004, Fiorillo asked defendant Norris when the revised loan

documents would be ready.  Defendant Norris responded that, "Massad and Mallegni

changed their mind about the terms of the deal and there is nothing I can do about it.  Why

don't you just refinance it." Defendant Norris then abruptly hung up the phone.

115.     By in or around October 2004, Fiorillo had arranged to refinance defendant LBM

Financial's first mortgage through Webster First Federal Credit Union for $400,000.

116.     On or about January, 2005, defendant Norris sent a pay-off letter to Webster First Federal

Credit Union for approximately $495,000, which included over $135,000 in fraudulently

inflated interest charges, late fees and default points and represented an effective annual

interest rate of over 64%.

117.     In an effort to get out from under defendant LBM Financial usurious interest payments,

Fiorillo agreed to defendant Mallegni's proposal to discharge defendant LBM's loan on the

property and place a second mortgage on the property for $95,000 which represented the

35

amount of the alleged "shortfall" from the Webster First loan. In fact, almost all of the

$95,000 represented fraudulently inflated and usurious interest charges.

### Stafford Hill Estates Purchase

118.    In or around December 2003, Fiorillo entered into a purchase and sale agreement to

purchase a 66 acre parcel of land in Leicester, MA for $3,000,000. Fiorillo received a loan

for $50,000 to be used as deposit money to put the deal under contract from an investment

partner, Henry Vara. This land was improved with a 180 +/- unit approval for a 55 plus

subdivision development and had "as is" value that was substantially many millions more.

119.    Shortly thereafter, Fiorillo was approached by Defendant Massad who expressed extreme

interest in participating in the financing of the purchase and construction of the development.

Defendant Massad told Fiorillo that he would arrange financing through defendant

Commerce Bank. Defendant Massad further told Fiorillo that, in return for arranging the

financing, he wanted an ownership interest in the project.

120.    By in or around April 2004, Fiorillo had arranged to sell the property to Toll Brothers for

approximately $12 million. At that time, Fiorillo had yet to purchase the property.

121.    On or about April 13, 2004, Fiorillo signed a purchase and sale agreement with Toll

Brothers to sell the property for $12 million.

122.    On or about April 13, 2004, defendant Massad invited Fiorillo to defendant Commerce

Bank to address the bank's Board of Directors about the deal. Ultimately, defendant

Commerce Bank refused to finance Fiorillo's purchase of the property so long as defendant

Massad sought an ownership interest.

36

123.   In or around May 2004, defendant Massad instructed Fiorillo to contact defendant

Mallegni to finance the purchase through defendant LBM Financial.

124.   On or about May 20, 2004, defendant LBM Financial issued a commitment letter to

Fiorillo to fund the purchase of the property.

125.   Shortly thereafter, defendant Mallegni began to demand that Fiorillo relinquish an ever-

increasing share of his ownership of the project to defendants Mallegni and Massad in return

for defendant LBM Financial to provide financing for the loan. Within a few days of the

scheduled closing, Fiorillo's ownership interest had been forcibly reduced to 3%.

126.   In or around June 2004, Fiorillo complained to defendant Massad about defendant

Mallegni's increasing demands for ownership. Defendant Massad assured Fiorillo that he

would receive at least a 35% ownership interest and told him, "I'm gonna finally let you

make some money kid, you're gonna be all set, all set Nicky!"

127.   In or around June 2004, on the day of the scheduled loan closing, Fiorillo was informed

that defendants Massad and Mallegni no longer wished to fund Fiorillo's purchase of the

property. As a result, Fiorillo lost his $50,000 deposit on the property and the opportunity to

profit from its sale to Toll Brothers for $12 million.

128.   In or around the fall of 2004, the project was sold to an investment group headed by

Kevin McManus, a close associate of defendants Massad and Mallegni.

## Evergrass Loan – Depietri Family Home

129.   In or around April 2005, Evergrass, Inc. ("Evergrass"), a company owned by Depietri,

sought a $200,000 business loan from defendant LBM Financial. Under the terms of the loan

agreed to by Depietri and defendant Mallegni, the loan would be secured by the plant,

fixtures, receivables and equipment of Evergrass. Robert and Kimbrly Depietri also were required to sign a personal guaranty on the loan.

130.    On or about April 19, 2005, at the closing of this loan, defendant Norris, who was representing both defendant LBM Financial and Kimbrly Depietri demanded, for the first time, that the Depietris personal guaranty on the Evergrass loan be secured by a second mortgage on their family home located at 4 North Pond Road, Worcester, Massachusetts. When Kimbrly Depietri was presented with the 2nd mortgage, she immediately protested and demanded to speak with defendant Mallegni. She was assured by defendant Norris that "nothing would happen to your house" and that the deal was structured that way only to "make the investors happy." Relying, in part, upon the assurances of defendant Norris, and wanting to close the Evergrass loan as soon as possible, the Depietris executed a guaranty secured by a second mortgage on their family home located at 4 North Pond Road, Worcester, Massachusetts.

131.    On or about April 21, 2005, attorney Michael Norris, acting at the direction of defendant Mallegni, wrote an unauthorized check out of the loan proceeds in the amount of $23,334.36, made payable to defendant Mallegni, personally.

132.    As of April 21, 2005, neither Evergrass nor the Depietris owed $23,334.36 to defendant Mallegni personally, nor did they authorize its payment either to defendant Mallegni, or to defendant LBM Financial, from the loan proceeds. Despite writing this check from the loan proceeds, attorney Norris prepared a HUD-1 Settlement Statement that failed to disclose this $23,334.36 payment to defendant Mallegni. Defendant Mallegni signed this fraudulent HUD-1.

133.    On or about April 21, 2005, attorney Norris mailed a copy of the fraudulent HUD-1

Settlement statement to Depietri.

134.    On or about August 29, 2005, Evergrass refinanced its loan with defendant LBM

Financial and obtained a $300,000 loan.  When the Depietris were presented with the second

mortgage documentation, they immediately confronted Norris about the agreement to remove

the second mortgage on their home.  Attorney Norris replied, "I talked with Marcello and he

did not want to remove it.  If you do not resign the new one, I have explicit orders to

commence immediate foreclosure on the original note."  Faced with this threat of foreclosure

on their home, the Depietris for the second time executed a guaranty for the loan secured by a

second mortgage on their family home.

135.    From on or about August 29, 2005, through on or about June 30, 2006, defendant LBM

Financial fraudulently assessed interest payments on the Evergrass loan at a rate of

approximately 42%, which was 28% higher than the stated contract amount.  As a result,

Evergrass overpaid defendant LBM Financial approximately $95,000.

136.    In or around June 2006, Evergrass ceased making interest payments due to defendants

Mallegni and LBM Financial attempted collection of usurious and otherwise fraudulently

inflated debts on various Depietri-affiliated projects including 219 Forest.  Thereafter,

defendants Mallegni and LBM Financial made no further efforts to collect this loan from

Evergrass.

## 57 East Main Street Realty Trust Loan

137.    In or around November 1998, Depietri and defendant Mallegni agreed that defendant

LBM Financial would provide a $650,000 second mortgage loan in connection with the East

Main Street Trust's acquisition of a commercial property located at 57 East Main Street,

Westborough, Massachusetts. The sale price was $4.2 million.

138.   On or about February 14, 1999, days before the scheduled loan closing, defendant

Mallegni notified Depietri that defendant LBM Financial would only loan the East Main

Street Trust $325,000, one-half of the amount previously agreed upon. Moreover, defendant

Mallegni demanded a 25% non-voting ownership interest in 57 East Main Street LLC, the

beneficial owner of the trust. Rather than lose the substantial deposit that he had put down

on the property, Depietri agreed to defendant Mallegni's demands.

139.   On or about February 16, 1999, defendant LBM Financial loaned the East Main Street

Trust $325,000 in connection with the purchase of the property. Depietri loaned the trust an

additional $325,000 from personal funds.

140.   In or around July 2001, the East Main Street Trust sought to refinance the first and second

mortgages on the property. As part of that transaction, the loan from defendant LBM

Financial would be paid down 50% to $162,500.

141.   On or about July 16, 2001, hours before the scheduled loan closing, defendant Mallegni,

through defendant Norris, demanded that, as a condition for accepting the pay down of the

second mortgage, that he (Mallegni) receive a priority cash flow distribution towards his 25%

ownership interest. Defendant Mallegni further caused defendant Norris to provide a payoff

letter that calculated interest at a rate of 20%, rather than the contract rate of 12%. Finally,

defendant Mallegni demanded that the Trust execute a new note, secured by a second

mortgage of $200,115.40, which represented the $162,500 balance of the original loan plus

one-half of the fraudulently inflated interest charges. Again, fearing the loss of the

40

refinancing opportunity and thousands of dollars of expenses already paid in connection with the refinancing, Depietri capitulated to defendant Mallegni's demands.

142.    As of July 16, 2001, defendant LBM Financial had received over $151,000 in fraudulently inflated interest and $162,500 in principal on its $325,000 loan. Depietri had received no principal or interest payments on his $325,000 loan to the Trust.

143.    In or around July 2003, Depietri notified defendants LBM Financial and Mallegni that the trust wanted to extend the $200,115.40 note for another two-year term.

144.    From in or around July 2003 through on or about March 31, 2004, defendants LBM Financial and Mallegni refused to provide Depietri with extension documents for the loan.

145.    On or about March 31, 2004, defendant Norris faxed the loan extension documents to Depietri along with a cover letter in which defendant Mallegni conditioned the granting of the loan extension with Depietri releasing defendant Norris from the balance of his ten year lease obligations with the Boston Post Road Trust.

146.    On or about March 31, 2004, Depietri called defendant Mallegni to protest his extortionistic demands for the loan extension. Defendant Mallegni told Depietri to, "sign the release for Michael (Norris) or we will bury you in default interest." Depietri refused to accede to defendant Mallegni's demands.

147.    On or about February 26, 2007, defendants LBM Financial and Mallegni caused a letter to be sent to Depietri claiming that defendant LBM Financial was owed approximately $1.1 million on its $200,115.40 loan. This claim represented an effective annual interest rate of approximately 95%.

41

148.    In or around April 2007, after counsel for the East Main Street Trust disputed defendant
LBM Financial's interest calculation, defendant LBM Financial sent a letter to Depietri
claiming to be owed $554,000, which represented an effective annual interest rate of over
47%.

149.    On or about June 13, 2007, defendant LBM Financial caused a payoff letter to be sent to
Depietri in connection with a refinance of the property claiming to be owed $648,316.09.

150.    On or about June 18, 2007, with Depietri and the trustee having determined to be free of
defendants LBM Financial and Mallegni and their pattern of fraud and extortion, paid off the
loan for $654,600.63.  Over the life of the $325,000 loan, defendants LBM Financial and
Mallegni received almost $750,000 in usurious and fraudulently inflated interest charges.

### 7-21 Erie Avenue Loan

151.    In or around November 2005, Fiorillo was approached by defendant Mallegni to "bailout"
an eight-unit townhouse condominium development, located at 7-21 Erie Avenue, Worcester
("the Erie Avenue project"), which previously had been financed by defendant LBM
Financial and had been reacquired by defendant LBM through foreclosure.

152.    At the direction of defendant Massad, defendant Mallegni would not agree to loan money
to Fiorillo unless Depietri agreed to be liable on the Note as well.  At that time, Depietri was
attempting to assist Fiorillo with the development of the Airline Lewis property.

153.    In or around November, 2005, Fiorillo and Depietri formed the Erie Avenue Residential
Realty Trust to acquire the Erie Avenue project from defendant LBM.

42

154.   On or about November 14, 2005, Fiorillo and Depietri attended the closing of the

$1,010,000 acquisition and construction loan from defendant LBM Financial to the Erie

Avenue Trust.

155.   At the loan closing, attorney Michael Norris, who represented all parties to the

transaction, informed Fiorillo, for the first time, that Fiorillo, personally, would be required to

grant a $1,010,000 second mortgage to defendant LBM Financial secured by several

properties owned by Fiorillo, including his family home on 425B Salisbury Street, Worcester,

Massachusetts.  Fiorillo refused and stated that he would not complete the closing.  Attorney

Norris left the room and walked across the hall and spoke with defendant Mallegni. Upon his

return, Norris stated to Fiorillo that unless he agreed to the deal and allowed the second

mortgage to be recorded, defendant Mallegni would have defendants Massad and LBM

Financial LBM foreclose on all other outstanding loans Fiorillo had with them and seek to

collect the deficiencies from the foreclosures against Fiorillo's family home.  Norris further

stated, "What's the difference, you either give us the mortgage now, or we will foreclose on

you later.  This way you have a shot of making a little money.  Sign the documents or my

instructions are to throw you out of this office and send you foreclosure notices on all the

other loans."

156.   Fearing this retaliation from defendants Mallegni and Massad, Fiorillo agreed to the loan

terms.

157.   At the urging of defendant Mallegni, Fiorillo and Depietri selected LaCourse

Construction Corp. to complete the work on the Erie Avenue project.  Defendant Mallegni

represented to Depietri and Fiorillo that LaCourse was a reliable contractor who could

complete the job in a timely and quality fashion.

158.    In or around November, 2005, LaCourse Construction began work on the Erie Avenue

project.

159.    Unknown to either Depietri or Fiorillo at the time, defendant Mallegni had instructed

LaCourse Construction not to pull the necessary construction permits for the project from the

City of Worcester.  When Kenneth LaCourse, the owner of LaCourse Construction

questioned defendant Mallegni as to why he would want to risk having the project shut down

by the city, defendant Mallegni responded, "Kenny, the longer the project takes to finish, the

more money Duddie [Massad] and I can make on the interest.  That's how we really make

our money, default interest, late fees and points."

160.    By in or around June 2006, despite the maneuverings of defendant Mallegni, Fiorillo and

Depietri had substantially completed the Erie Avenue project and had six units under

purchase and sale agreements, representing approximately $1.1 million in sales.

161.    In or around October 2006, as part of a settlement with defendants LBM and Mallegni,

Fiorillo was forced to give Mallegni, personally, a 25% ownership interest in the Erie Avenue

project.  As part of this agreement, defendant Mallegni was not to be paid any profits from

the project until the loan to defendant LBM Financial was paid off.

162.    Between August and November 2006, defendant Mallegni was presented four purchase

and sale agreements for sales at the Erie Avenue project.  Defendant Mallegni refused to sign

the discharges from defendant LBM Financial unless he was paid his 25% profit out of each

44

loan closing. This would result in Erie Avenue being unable to make a timely repayment of its loan from defendant LBM Financial.

163.    As a result of defendant Mallegni's refusal to sign loan discharges, Erie Avenue lost the scheduled sale of the four units at a total purchase price of approximately $800,000.

### The 425B Salisbury Street Loan – Fiorillo Family Home

164.    In or around May 2003, Fiorillo and Krowel purchased a single family home at 425B Salisbury Street, Worcester, Massachusetts. In order to facilitate this purchase, Fiorillo and Krowel received a $100,000 loan from Entrust Financial, an entity in which defendant Massad upon information and belief was an investor and part owner. Defendant Massad arranged for the Entrust Financial loan.

165.    In or around May 2004, defendant Massad informed Fiorillo and Krowel that, in order to receive additional extensions of credit from any entity with which defendant Massad was affiliated, Fiorillo and Krowel would have to become part of the "Commerce Bank Family." Specifically, defendant Massad instructed Fiorillo and Krowel to apply for a re-financing of their family home through defendant Commerce Bank. Defendant Massad further informed Fiorillo that he wanted the Entrust Financial loan paid off. Defendant Massad further told Fiorillo that if he did not arrange for this re-financing he would have defendants LBM Financial and Gamewell begin foreclosure proceedings on his other properties. In order to maintain the goodwill of defendant Massad and the financial entities he controlled, Fiorillo and Krowel agreed to the refinancing.

166.    By in or around July 2004, Fiorillo and Krowel were heavily involved in several commercial real estate ventures and were seeking financing or refinancing through entities in

which defendant Massad had an interest or controlled, including defendants Gamewell and LBM Financial.

167.    In or around July 2004, defendant Massad repeatedly advised Fiorillo and Krowel that they would receive formal commitments to finance these projects once they had finished the re-finance of their family home through defendant Commerce Bank.

168.    On or about July 26, 2004, defendant Pamela Massad called Fiorillo and Krowel and instructed them to come to the closing of the refinance of 425B Salisbury Lane at the offices of Fletcher Tilton and Whipple.   During the course of that call, defendant Pamela Massad informed Fiorillo and Krowel that they would not need their own attorney and to "get yourselves in here before my father changes his mind about all the other money you want to borrow."

169.    Once at the loan closing, defendant Pamela Massad then informed Fiorillo and Krowel, instead of the conventional loan for $547,000 with a fixed rate of 5.5% that initially had been discussed with defendant Massad, the loan instead would be a $330,700 non-conventional five year arm with a rate that could go as high as 11.5%, and a home equity line of credit for $216,300 with an interest rate that could go as high as 18%.

170.    During the course of the loan closing, defendant Pamela Massad presented Krowel with several Commerce Bank temporary checks, on which the name "Tracy Krowel" had been hand- printed at the top.   The checks all had been post-dated to July 30, 2004, which was after Krowel's right of rescission would have lapsed.

171.    Defendant Pamela Massad informed Krowel that the checks were written from the home equity line of credit and that she needed to sign the checks in order to close the loan.

46

172.    One of the checks presented to Krowel was dated July 30, 2004, which was the date the

loan proceeds would disburse, and payable to defendant Massad personally.  Defendant

Pamela Massad instructed Krowel to sign the check payable to defendant Massad and to write

in the memo section "Kevin McManus loan repayment."

173.    As of July 26, 2004, neither Fiorillo nor Krowel owed defendant Massad any money in

his individual capacity and they informed defendant Pamela Massad of that fact.

174.    Fiorillo called defendant Massad to object to the payment of $35,000 to him and to

demand an explanation.  Defendant Massad told Fiorillo that if he did not tell Krowel to sign

the check he would make sure all the other promised credit would never be extended and

Fiorillo and Krowel would lose all of their deposit monies.  During the course of the call,

defendant Massad stated to Fiorillo, "Son, just get that check signed or I'm gonna have to cut

you off, we'll be through…lose my number.  You're gonna blow your money, blow your

wife's credit, and if you embarrass me and try to stick me for the $35,000, I'll foreclose on all

the other loans you got with me and my companies.  Now sign the fucking check!"

175.    Fiorillo then returned to the conference room and was then threatened by Pamela

Massad, "sign that check or we'll foreclose on your other loans, and you can forget about the

other money you want from my dad, now tell your wife to sign the check over to my father"

176.    Krowel the signed the $35,000 check payable to defendant Massad and the refinancing

loan closed.

177.    From on or about July 26, 2004 through at least in or around April 2007, defendants

Massad and Pamela Massad repeatedly have threatened to foreclose on the 425B Salisbury

47